The **TRAVELODGE CORPORATION**,
Plaintiff,

v.

**Frank J. SIRAGUSA et al., Defendants.**
Civ. A. No. 10303.

United States District Court
N. D. Alabama, S. D.
April 3, 1964.

Drayton T. Scott, L. Murray Alley, of Cabaniss, Johnston, Gardner & Clark, Birmingham, Ala., and Arch R. Tuthill and John J. Waller, of Flint & MacKay, Los Angeles, Cal., for plaintiff.

Jennings, Carter & Thompson, and Hugh P. Carter, Birmingham, Ala., for defendants.

LYNNE, Chief Judge.

Complaining of a violation by defendants of its registered service mark and of unfair competition on their part in the use of the mark as hereinafter described, plaintiff prays for an injunction against the continued use by defendants of such mark. Alleging their use of such mark in Alabama prior to plaintiff and acquisition thereby of the right to the exclusive use thereof within the State of Alabama, and further, fraud by the plaintiff in procurement of its registered service mark, by their counterclaim defendants seek an injunction against plaintiff's use of the mark in Alabama, cancellation of plaintiff's mark or, alternatively, restriction of plaintiff's mark to exclude its use thereof in Alabama or at least in Birmingham. Both parties concede, as indeed they must, that there is actual, substantial and constant confusion resulting from their simultaneous use of the identical descriptive name. Each party claims damages for past infringement and unfair competition but neither party offered proof of any monetary damage suffered and, in effect, abandoned their respective claims for consequential damages.

Plaintiff, a California corporation, has developed and operates a chain of more than 250 motels, located throughout the United States as well as in Canada and Europe, having a value of approximately $95,000,000. All of these motels are operated and advertised under the trade name "TraveLodge". This name was originated by Scott King who built the first motel bearing the name which opened in December, 1940, at San Diego, California. At that time King contemplated a nationwide chain of motels but their construction and development was interrupted by the war. In 1946, Scott King and others incorporated under the name "The TraveLodge Corporation" and began construction and operation of a chain of motels. By 1947, four TraveLodge motels had been completed and by the end of 1948, seven motels were in operation.

In 1948, Joe L. Siragusa built and began operating in Birmingham, Alabama, a thirteen-room motel and restaurant under a trade name identical to the plaintiff's TraveLodge. Since Joe L. Siragusa's death in 1953, the defendants have operated this business and continued to use the name TraveLodge.

■ The original TraveLodge motel, located on El Cajon Boulevard in San Diego, California, has been in continuous operation since its opening in 1940. The evidence discloses that James P. Siragusa was stationed in the armed service in San Diego, California, in 1943 and 1944 and returned to San Diego after serving overseas. Defendant, James P. Siragusa,

was joined for some time in San Diego by his wife and his mother, Annie A. Siragusa, also visited him while he was stationed in San Diego. Defendants admit that after James P. Siragusa returned to Birmingham, he and the rest of the family discussed the selection of a name for the motel being built by their father and husband. Not only was the name selected by them identical to the plaintiff's name with the two words "Travel" and "Lodge" combined and a single letter used for the last "l" of "Travel" and the first "L" of "Lodge", but the "T" and "L" were extended and offset in precisely the same manner as plaintiff's mark.* The two marks are identical. The court, though recognizing that human ingenuity is not limited by the laws of permutations and combinations, expressly finds that defendants and their predecessor, Joe L. Siragusa, intentionally and deliberately copied and appropriated plaintiff's distinctive trademark.

Defendants argue in brief that plaintiff must show that defendants "fraudulently" appropriated its mark. The courts have frequently recognized that each trademark case must be decided on its own peculiar facts and that similar cases are of limited help in this area of the law. American Foods, Inc. v. Golden Flake, Inc., 312 F.2d 619 (5th Cir. 1963). With this caveat in mind, a review of the cases reveals that neither Alabama cases nor general authority support defendants' contention that actual fraud must be shown. No Alabama case has been found where a *strong* trademark was willfully appropriated. Several Alabama decisions, however, indicate that actual fraud is not a necessary element even where *weak* marks are imitated. Thus, in Mobile Transfer Co. v. Schwarz, 195 Ala. 454, 70 So. 640 (1916), the court held that the elements to be proved in unfair competition in the imitation of another's trade name or trademark were the adoption of the mark by plaintiff and its imitation by defendant without license or acquiescence by the plaintiff. In Boston Shoe Shop v. McBroom Shoe Shop, 196 Ala. 262, 72 So. 102 (1916), the court stated:

" * * * [W]hile design is significant, and may be in many cases of controlling importance, neither design nor actual fraud in such an imitation is a necessary element of the right to relief. * * * "

■ The fact, explicitly found herein, that defendants intentionally and willfully appropriated plaintiff's *strong* mark of unique and clever design, compels the conclusion that plaintiff is entitled to relief absent a showing of actual fraud or fraudulent intent on the part of the defendants or their predecessor. This conclusion is supported by clear and convincing authority from many jurisdictions. In the early Second Circuit case of Aunt Jemima Mills Co. v. Rigney & Co., 247 F. 407 (1917), the court stated:

"To use precisely the same mark, as the defendants have done, is, in our opinion, evidence of intention to make something out of it—either to get the benefit of the complainant's reputation or of its advertisement or to forestall the extension of its trade. There is no other conceivable reason why they should have appropriated this precise mark. The taking being wrongful, we think the defendants have no equity to protect them against an injunction, * * *."

To the same effect is Judge Learned Hand's opinion in the case of My-T Fine Corp. v. Samuels, 69 F.2d 76 (2d Cir. 1934), wherein he stated:

" * * * We need not say whether that intent is always a necessary element in such causes of suit; probably it originally was in federal courts. * * * But when it appears, we think that it has an important procedural result; a late comer

---

* The service mark in use by each of the parties is thus constructed:

TRAVELODGE

who deliberately copies the dress of his competitors already in the field, must at least prove that his effort has been futile. Prima facie the court will treat his opinion so disclosed as expert and will not assume that it was erroneous. * * * [S]uch an intent raises a presumption that customers will be deceived."

This rule has been followed by the Fifth Circuit in the recent case of Thompson v. Alpine Motor Lodge, Inc., 296 F.2d 497 (5th Cir. 1961), where the court enjoined a subsequent appropriator though the names were not identical and were not *strong* marks as is the case here. The court stated:

"* * * The implicit rationale is the ancient doctrine that a man intends the natural and probable consequences of his acts. When he knows of a trade name used by another person and, notwithstanding this knowledge, uses a similar name in his own business operations, the courts will presume that he has encroached upon the name of the other intentionally and fraudulently. * * *"

While the courts in some of the trademark cases lay emphasis upon the fact of an established secondary significance of plaintiff's mark in the area where defendant subsequently uses the mark, it will be noted, however, that in most, if not all, of those cases the junior user has unwittingly and unknowingly imitated plaintiff's mark. Where intentional appropriation is shown there is no requirement for the establishment of such secondary significance. Thus, in Pike v. Ruby Foo's Den, 98 U.S.App.D.C. 126, 232 F.2d 683 (D.C. Cir. 1956), involving the use of the name by two restaurants, one in New York and one in Washington, D. C., the court found no secondary significance, but held that the knowledge of the junior user of the senior user's mark was sufficient predicate for enjoining such use. The court stated:

"The Federal cases are virtually unanimous against a knowing junior user. See, for example, Food Fair Stores, Inc., v. Food Fair, Inc., 1 Cir., 1949, 177 F.2d 177; Stork Restaurant, Inc., v. Sahati, 9 Cir., 1948, 166 F.2d 348; White Tower System, Inc., v. White Castle System, 6 Cir., 1937, 90 F.2d 67; Buckspan v. Hudson's Bay Co., 5 Cir., 1927, 22 F.2d 721, certiorari denied, 1928, 276 U.S. 628, 48 S.Ct. 321, 72 L.Ed. 739; Sweet Sixteen Co. v. Sweet '16' Shop, Inc., 8 Cir., 1926, 15 F.2d 920. Although all of these cases involve at least minor contacts by the senior user with the locale in which the junior user is doing business, so that knowing junior use is not the sole factor present, at least one commentator has concluded that '*the presence of notice is the determinative factor, usually sufficient in itself to bar the second user's claim.*' Developments in the Law—Trade Marks and Unfair Competition, 68 Harv.L.Rev. 814, 858 (1955). * *" (Emphasis supplied.)

In Karen Industries, Inc. v. Chiaverotti, 181 F.Supp. 827 (E.D.Wis.1960), the court said:

"In any event, as stated in Adam Hat Stores, Inc. v. Scherper, D.C., 45 F.Supp. 804, 806, any rights of a second user in a territory not already occupied by the first user are subject to the conditions:

"'* * * that the second user must have innocently adopted the mark and must show it was not adopted for the purpose of forestalling the first user's extension of his mark in that territory.'"

To the same effect are the following cases: National Circle, Daughters of Isabella v. National Order, D.I., 270 F. 723 (2d Cir. 1920); Safeway Stores v. Sklar, 75 F.Supp. 98 (E.D.Pa.1947); Looz, Inc. v. Ormont, 114 F.Supp. 211 (S.D.Cal.1953) and Lincoln Restaurant Corp. v. Wolfies Rest. Inc., 185 F.Supp. 454 (E.D.N.Y.1960), 291 F.2d 301 (2d Cir. 1961), cert. denied 368 U.S. 889, 82 S.Ct. 143, 7 L.Ed.2d 88 (1961).

It is the further opinion of the court that plaintiff is entitled to relief under

that aspect of its complaint based upon infringement by defendants of its service mark registered under the Lanham Act. (15 U.S.C. § 1051 et seq.) The evidence discloses that plaintiff's service mark was published in the principal register on March 10, 1953, on application originally filed October of 1949 and subsequently several times amended. The affidavit of five continuous years of use was filed in 1958. Plaintiff's registered service mark therefore became incontestible under the provisions of 15 U.S.C. § 1065. Under Title 15 U.S.C. § 1115, such incontestible mark is conclusive evidence of plaintiff's exclusive right to the use of such mark unless one or more of the defenses specified in Section 1115 are available to defendants. In this regard, defendants urge that they have used the mark continuously from a time prior to the registration as covered by subsection (b) (5) and further that the registration was obtained fraudulently.

■ As to defendants' first contention, it is clear from the language of subsection (b) (5) that defendants have not established this defense. Before they are entitled to rely upon their use prior to plaintiff's registration they must prove that the mark "was adopted without knowledge of the registrant's prior use." The failure of proof in this respect is implicit in the court's finding that defendants intentionally copied and adopted plaintiff's mark. Defendants, seeking to avoid the effect of the language of Section 1115, insist that Section 1115 has no field of operation as to them since under its terms it applies only after a mark has become incontestible under the provisions of Section 1065. Defendants point to the proviso of Section 1065 that a mark shall be incontestible "except to the extent, if any, to which the use of a mark registered on the principal register infringes a valid right acquired under the law of any State or Territory by use of a mark or trade name continuing from a date prior to the date of the publication under this chapter of such registered mark * * *." Although Sections 1065 and 1115 have not been authoritatively construed in reported cases, the court is of the opinion that if defendants are correct in their contention, Section 1115 is a meaningless and useless repetition of Section 1065 since each defense referred to in Section 1115 is also an exception under Section 1065. Though · Section 1065 may declare the conditions under which a mark becomes incontestible, it is this court's opinion that Section 1115 declares the effect of such incontestibility and before defendants can rely upon this defense they must show that their prior use was without knowledge of plaintiff's mark. But, assuming *arguendo* that defendants are correct in their interpretation of the meaning of the two sections, it is of no avail since, as discussed above, defendant acquired no right under the law of Alabama by their wrongful and intentional copying of plaintiff's mark.

■ Defendants further seek to avoid the effect of the registration of plaintiff's mark under the Lanham Act on the ground that such registration was fraudulently obtained and in their counterclaim pray for the cancellation of such mark. Section 1115(b) (1) unquestionably provides that the registration shall not be conclusive evidence of exclusive right to use the mark if "the registration or the incontestible right to use the mark was obtained fraudulently." Likewise, Section 1119 grants this court power to order cancellation of the registration and Section 1064 includes as grounds for such cancellation: "[I]ts registration was obtained fraudulently." Defendants argue that the affidavit of Scott King that the service mark was first used in May of 1939 as contained in the application for registration is false in that the evidence shows that the opening date of the first TraveLodge Motel was in 1940 and that the mark was not being used in commerce. Plaintiff's witness, Scott King, admitted that the first TraveLodge was not opened until 1940. He testified, however, that his statement in the application that the name was first used in May of 1939 was based on the fact that he was at that time in the construction business and actively seeking persons from various states who might wish to construct motels and in that connection he was discussing

with others having a potential interest the use of the name "TraveLodge". Whether or not such use of the name constituted use of the mark under the Lanham Act is unnecessary for decision for two reasons. First, there is no evidence or permissible inference that the facts stated in the affidavit, even if false, were fraudulent. Defendants assumed, but did not discharge, the burden of proving such fraud, not just some misstatement in the affidavit. Seaporcel Motels, Inc. v. American Siporek Corp., 125 U.S.P.Q. 664 (1960); Philco Corp. v. Clary Corp., 123 U.S.P.Q. 420 (1959); National Tuberculosis Ass'n. v. Summit County Tuberculosis & Health Ass'n., 122 F.Supp. 654 (N.D.Ohio 1954). Secondly, it is clear from an examination of the application for registration that the examiner did not rely upon the affidavit of Mr. King attacked by defendants, but it was expressly withdrawn and another affidavit substituted in lieu thereof. It is certain that by the time the registration was granted, plaintiff's use in commerce was clearly established. Macaulay v. Malt-Diastase Co., 55 App.D.C. 277, 4 F.2d 944 (D.C.Cir. 1925); Continental Distilling Corp. v. Old Charter Dist. Co., 88 U.S. App.D.C. 73, 188 F.2d 614 (D.C. Cir. 1950). Having found that there was no fraud in procurement of the registration, the court concludes that under the Lanham Act, plaintiff's registration of its service mark is conclusive evidence of its right to use such mark to the exclusion of defendants' use and entitles plaintiff to injunctive relief.

In addition to the defendants' intentional and wrongful taking and appropriation of plaintiff's service mark, which, as demonstrated, the court considers sufficient to dispose of the case, plaintiff submitted substantial evidence that at the time of defendants' first use of its mark, the mark had an established secondary significance which would entitle plaintiff to relief even if defendants' use were deemed innocent of willful imitation. The traditional notions of limited market area pervading the earlier cases dealing with product trademarks are not persuasive in this day of modern communication and travel. Recent decisions involving restaurants and chain stores manifest this expanding concept of the market area for such establishments and the consequent reduced influence of the earlier cases. E. g., Lincoln Restaurant Corp. v. Wolfies Rest. Inc., 185 F.Supp. 454 (E.D.N.Y.1960), 291 F.2d 302 (2d Cir. 1961), cert. denied, 368 U.S. 889, 82 S.Ct. 143, 7 L.Ed.2d 88 (1961), and Food Fair Stores, Inc. v. Lakeland Grocery Corp., 301 F.2d 156 (4th Cir. 1962). This element is even more important in the case at bar, however. By definition, a motel draws its customers from an area other than the one of its location. In this area of expanding travel a motel's market is deemed nationwide.

The evidence is uncontradicted that prior to defendants' appropriation of plaintiff's mark, plaintiff was advertising its motels by listings in AAA and other auto club tour books and directories and was distributing postcards, stationery, matches, and other advertising material. That the tour books and directories advertising plaintiff's motels were distributed in the Birmingham area as early as 1947 is undisputed. It seems clear that for the purposes of the motel business, plaintiff's activities prior to defendants' appropriation of its name were sufficient to create secondary significance of that name in the Birmingham area. If, however, as defendants contend, plaintiff's activities in this regard were insufficient to establish secondary significance, it is apparent that defendants have not acquired the secondary significance they argue is necessary for protection of the trade name, since, under the uncontroverted evidence, defendants' advertising activities for the entire period from 1948 until the present were considerably more limited than plaintiff's activities prior to 1948. The defendants have never listed or advertised their motel in any directory; even when their motel was new, it did not meet AAA's standards for listing. Defendants have never employed billboards or magazine advertising, and though there is evidence that postcards

and matches and stationery were distributed, there is no evidence as to the quantity of such distribution. Defendants' other advertising, prior to the time this suit was filed, was limited to ads appearing in the local newspaper, the majority of which emphasize the menu of their restaurant and private club and not the facilities of the motel.

■ Without doubt, subsequent to 1948 plaintiff's trade name had secondary significance in this area. Plaintiff's advertising increased as the number of motels increased and the evidence discloses a total expenditure in excess of $3,500,000; the distribution of more than 3,450,000 of its own TraveLodge directories, in addition to its listings in numerous other directories and tour guides, 1,900 highway billboards throughout the United States and ads in magazines of nationwide circulation, such as Newsweek, Business Week, Time, U. S. News and World Report, and Holiday. Thus, even assuming as defendants argue, that their adoption of plaintiff's mark was innocent, plaintiff is entitled to the relief it seeks in view of the established secondary significance in Alabama of plaintiff's mark prior to its adoption by defendants or at least prior to defendants' use of the mark acquiring secondary significance and identification with their motel operation. Family Record Plan, Inc. v. Mitchell, 172 Cal.App.2d 235, 342 P.2d 10 (1959); Jenney Mfg. Co. v. Leader Filling Stations Corp., 291 Mass. 394, 196 N.E. 852 (1935); Restatement of Torts, § 717, Comment (f).

Finally, a very important factor clearly distinguishes the case at bar from the cases relied upon by the defendants, all of which involve legitimate and ordinary use of a trade name or trademark by the junior user. Such is not the case here. A motel is defined in Webster's Third New International Dictionary (1961) as "a hotel for automobile tourists." Defendants' operation clearly does not cater to the traveling public, for their "motel" is a mere adjunct to the private club known as the "Bamboo Room" operated by defendants. The most charitable inference which may be drawn from the evidence is that at the time this suit was instituted and on the date of the trial defendants were not engaged in the bona fide operation of a motel catering to transient guests. Of vital significance was the testimony of defendants themselves as to the services not offered by their "motel". There is no lobby; the motel takes no reservations, and it is closed on Sunday, as is the Bamboo Room. The defendants' own evidence disclosed that the average gross income from the motel was only $20.00 per day, and it is obvious to the court that such income is insufficient to support a motel operation were it not merely an adjunct to the private club.

■ It is clear to this court and it so finds that plaintiff has been irreparably damaged by defendants' wrongful use of plaintiff's mark and plaintiff will continue to suffer great and irreparable injury unless defendants are enjoined. Defendants admit that "the traveling public in the State of Alabama, has been and is likely to be deceived into thinking that the motel services of the parties hereto are sponsored by, associated with, or in some way connected with a common operator or source * * *." Joint use of a name creates many problems even if both users are selling quality products or offering quality services. But where one of the joint users, the defendants herein, not only offers inferior services but its establishment tolerates questionable activities, the injury to the other, plaintiff herein, is irremediable. Yale Electric Corp. v. Robertson, 26 F.2d 972 (2d Cir. 1928); Epperson & Co. v. Bluthenthal, 149 Ala. 125, 42 So. 863 (1906); "5"-Spot Short Range Gun Clubs of America, Inc. v. Rinehart, 56 Ohio App. 259, 10 N. E.2d 450 (1937); Ultem Publications, Inc. v. Arrow Publications, Inc., 166 Misc. 645, 2 N.Y.S.2d 933 (1938); Knights of the Ku Klux Klan v. Strayer, 34 F.2d 432 (3rd Cir. 1929). It also constitutes a violation of 15 U.S.C. § 1125 (a) which creates a cause of action for false description and misrepresentation in regard to goods or services rendered

in commerce. The court finds that defendants' use of the word "motel" with the trade name "TraveLodge" is a misrepresentation of the services rendered by defendants' establishment. This misrepresentation entitles the plaintiff to the relief sought. Mutation Mink Breeders Ass'n v. Lou Nierenberg Corp., 23 F.R.D. 155 (S.D.N.Y.1959); Gold Seal Company v. Weeks, 129 F.Supp. 928 (D.D.C.1955); S. C. Johnson & Son v. Gold Seal Co., 97 U.S.App.D.C. 282, 230 F.2d 832 (D.C. Cir. 1956), cert. denied, 352 U.S. 829, 77 S.Ct. 41, 1 L.Ed.2d 50 (1956); Norwich Pharmacal Co. v. Hoffmann-La Roche, Inc., 180 F.Supp. 222 (D.N.J.1960).

The court concludes that plaintiff is entitled to relief on the separate grounds hereinabove discussed, and that for the same reasons, there is no merit in defendants' counterclaim. The court has not arrived at its ultimate decision by considering each separate ground in isolation and by positing its judgment on alternative bases. Rather it has preferred to arrive at a result which weighs the totality of the facts and circumstances in the scales of established principles of law.